**STUCKER FORK CONSERVANCY DISTRICT, Appellant–Petitioner,**

v.

**INDIANA UTILITY REGULATORY COMMISSION and Utility Consumer Counselor, Appellees.**

**No. 93A02–9108–EX–370.**

Court of Appeals of Indiana, Second District.

Oct. 13, 1992.

John M. Cregor, Douglas E. Cregor, Cregor & Lalley, Indianapolis, Spencer J. Schnaitter, Madison, for appellant-petitioner.

Linley E. Pearson, Atty. Gen., Kirk A. Knoll, Deputy Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Judge.

Appellant Stucker Fork Conservancy District (Stucker) appeals the Order of the Indiana Utility Regulatory Commission (Commission), approved July 31, 1991, which assessed Stucker the Public Utility Annual Fee.[1] We restate the issue formulated at the pre-appeal conference as follows: Whether the assessment against Stucker must be the fee attributable to a municipal utility?

We affirm.

The Stucker Fork Conservancy District was established on April 9, 1964, pursuant to what is now I.C. 13–3–3–1 (Burns Code Ed.1990), for the purposes, *inter alia*, of flood prevention and control, improving drainage, and providing water supply, including the treatment and distribution of water for domestic, industrial, and public use. Prior to 1967, Stucker restricted its activities to flood control and drainage purposes. In 1967, Stucker agreed to become the local entity responsible for furnishing the necessary water treatment and regional water distribution for the newly-developed reservoir on Quick Creek, near the Muscatatuck River. Accordingly, Stucker amended its District Plan by electing to provide water supply systems pursuant to I.C. 13–3–4–1 (Burns Code Ed.1990) in order to use revenue bonds for financing.

This election placed Stucker under the jurisdiction of the Indiana Utility Regulatory Commission for the filing of the initial schedule of rates and charges to patrons of the district. I.C. 13–3–4–6 (Burns Code Ed.1990). In four subsequent orders, the Commission granted Stucker's request for a new schedule of rates and charges.[2] The Commission also approved Stucker's 1967, 1973, and 1980 petitions for extensions of its territorial authority to render water supply services to additional users outside of the original district boundaries.[3]

The Commission found that it had jurisdiction in each of the foregoing proceedings.[4] The Commission ordered Stucker to pay various "itemized charges as well as any additional costs which were or may be incurred in connection with th[e] cause[s]"[5]

---

1. I.C. 8–1–6–1 (Burns Code Ed.1991). Appellant seeks instead to pay the expenses of the investigation that are usually assessed against municipal utilities pursuant to I.C. 8–1–2–70 (Burns Code Ed.1991).

2. The Orders were issued on February 22, 1973, June 12, 1980, February 1, 1984, and July 31, 1991. The July 31, 1991 Order, together with the Commission's Nunc Pro Tunc addition dated August 7, 1991, is the Order upon which this appeal is based.

3. The original boundaries of the Stucker Fork Conservancy District encompassed parts of Scott and Jefferson Counties, Indiana. Pursuant to I.C. 13–3–4–4 (Burns Code Ed.1990), the territorial authority to render the service of water supply outside of the original boundaries of the district *requires* Commission approval.

Stucker's present territory includes parts of Scott, Jefferson, Jennings, Jackson, Washington, and Clark Counties, Indiana.

4. In one other proceeding the Commission refused to assert jurisdiction. In 1969, the Commission, for lack of jurisdiction, dismissed a joint petition filed by Stucker and the Austin Water Company, Inc., a public utility, for the sale of Austin's assets to the Conservancy District.

5. In its Brief, Stucker characterizes the coverage of this portion of the Orders as "reimbursement" expenses which are applicable to municipal utilities pursuant to I.C. 8–1–2–70. Brief of Appellant at 5.

in which jurisdiction was established *except* in the July 31, 1991 Order (Instant Order). Record at Exhibits A, B, D, E, F.

In the Instant Order, the Commission found that Stucker should be assessed the annual fee applicable to public utilities. The Commission also found that Stucker "is a conservancy district ... [which] owns and operates a water utility serving approximately 5,400 customers...." Record at Exhibit A, Finding 2. Stucker's current facilities include a water treatment plant supplied by the Muscatatuck River and supplemental stream flow, eight elevated storage tanks, and over 525 miles of distribution mains. The current water supply operations have been financed by federal loans and local grants.

## I.

The issue upon appeal is one of first impression and requires the harmonization of various provisions relating to the regulation of furnishing utilities to the public.[6] Our task is to determine the legislature's intent by considering the goals sought to be achieved and the reasons and policies underlying the statutes. *Matter of Middlefork Watershed Conservancy District* (1987) 1st Dist. Ind.App., 508 N.E.2d 574, 577. This requires a two-part analysis. The threshold determination is whether Stucker should be classified as a "public utility" or as a "municipally owned utility?" The question then posed is with regard to whether the fee attributable to the determined classification is applicable to Stucker?

### A. Classification

The terms employed within the public utilities context provide a necessary framework and the starting point for the analysis. The Spencer–Shively Utility Commission Act of 1913 (Public Utilities Act) and subsequent amendments provide key definitions. As used in the Public Utilities Act, the term "public utility" originally referred to "every corporation, company, individual, association of individuals, their lessees, trustees or receivers appointed by any court whatsoever, and *every city or town*, that now or hereafter may own, operate, manage or control ... any plant or equipment ... for the production, transmission, delivery or furnishing of heat, light, water or power ... either directly or indirectly to or for the pu[b]lic." Acts 1913, ch. 76, p. 167, § 1 (emphasis supplied). In the same Act, "municipality" was defined as "any city or town wherein property of a public utility or any part thereof is located." Acts 1913, ch. 76, p. 167, § 1.

In 1933, a series of significant terms were added to the Public Utilities Act. For the first time, the term "utility" was used to mean "every plant or equipment within the state used for ... the production, transmission, delivery, or the furnishing of heat, light, water or power ... to the public." Acts 1933, ch. 190, p. 930, § 1.[7] The legislature also created a definition for the term "municipally owned utility" which included "every utility owned or operated by a municipality." Acts 1933, ch. 190, p. 930, § 1. The term "municipality" was amended to mean "any city or town of the State of Indiana." Acts 1933, ch. 190, p. 929, § 1.

■ The legislative additions prompted a critical deletion from the definition of "public utility." Beginning with the 1933 amendment, a *public* utility no longer included or includes a municipality that may acquire, own, or operate a utility. Acts 1933, ch. 190, p. 929, § 1. For present provisions, see I.C. 8–1–2–1(a). Our Supreme Court affirmed the intent of the

---

**6.** The four main provisions construed include: Indiana Utility Regulatory Commission—General Provisions (I.C. 8–1–2–1 *et seq.*); Public Utility Fees (I.C. 8–1–6–1 *et seq.*); Municipal Utilities (I.C. 8–1.5–1–1 *et seq.* (Burns Code Ed.1991)); and Conservancy Districts—Water Supply Systems (I.C. 13–3–4–1 *et seq.*).

**7.** Subsequent opinions clearly distinguish these terms, and reach the conclusion that a "public

utility" is the owner of a "utility," and that a "utility" is the property or plant which provides service to the public. *Public Service Company of Indiana v. City of Aurora* (1939) 215 Ind. 311, 314, 19 N.E.2d 255, 256. To extend the reasoning, a municipal utility is a "city or town in the State of Indiana" that is the owner of a utility service.

legislature to remove municipally owned utilities from the general public utilities statute. *Wilkins v. Leeds* (1940) 216 Ind. 508, 510, 25 N.E.2d 442, 444. Consequently, municipally owned utilities are subject to the jurisdiction of the Commission only when specifically provided for by statute. *Accord Cities & Towns of Anderson v. Public Service Commission of Indiana* (1979) 2d Dist. Ind.App., 397 N.E.2d 303, 307 (conclusively establishing that "municipal utilities are not subject to the general grant of authority to the Commission" and that "those statutory provisions granting Commission certain powers over municipal utilities are strictly construed").

More recently, the legislature enacted special provisions regulating the transfer, acquisition, improvement, and operation of municipally owned utilities. I.C. 8–1.5–1–1 through 8–1.5–3–15 (as added by Acts 1982, P.L. No. 74, § 1). The statutes apply only to municipalities, except consolidated cities, that own or operate utilities. I.C. 8–1.5–2–1, 8–1.5–3–1. The legislature expressly stated that the municipal utilities statutes do not apply to utilities governed by I.C. 8–1–2 (Public Utilities Act) or I.C. 8–1–13 (Rural Electric Membership Corporation Act). I.C. 8–1.5–2–2.

The definitional section of Article 1.5 replicates several definitions used within the Public Utilities Act. No mention is made nor can an inference be drawn that conservancy districts were meant to be included under the municipal utilities statutes. As our Third District noted: "In construing a statute, it is just as important to recognize what a statute does not say as it is to recognize what it does say." *Irmscher v. McCue* (1987) 3d Dist. Ind.App., 504 N.E.2d 1034, 1037; *see also City of Muncie v. Campbell* (1973) 2d Dist., 156 Ind.App. 59, 295 N.E.2d 379, 383. Had the legislature intended to include conservancy districts which own or operate utilities within the classification of municipal utilities, as Stucker surmises, it could have done so.

Clearly, Stucker and, presumably, a host of other similarly-situated water supply systems were fully operational by the time the 1982 additions were promulgated. The municipal utilities statutes, however, do not recognize their existence.

Stucker nevertheless insists that it is not a public utility. Stucker relies upon *Martin v. Ben Davis Conservancy District* (1958) 238 Ind. 502, 153 N.E.2d 125, 133–34 for the proposition that conservancy districts are special taxing districts that have characteristics and attributes of a municipal corporation, although not municipal corporations for the purpose of the Indiana constitutional limitation on debt of two percent of assessed valuation. Stucker asserts that a conservancy district "is so similar to a municipal corporation, i.e., city or town, that the legislature found it necessary [in I.C. 13–3–3–74] ... to declare that a conservancy district is not subject to the constitutional limitation of indebtedness regardless of how it raised funds or the fact that its property and income were exempt from taxation." Brief of Appellant at 9–10. The implication that Stucker's perceived similarities are sufficient to establish itself as a "city or town" for utility classification purposes rests upon a weak foundation.[8]

First, the fact that conservancy districts are exempt from the two percent debt ceiling is inconclusive insofar as our analysis comparing the attributes of "public" versus "municipally owned" utilities. We note that *municipally owned* utilities are also exempt from the constitutional debt limitation. I.C. 8–1.5–2–14. Thus, it appears that by eliminating the limitation on constitutional debt, the legislature intended to place owners of utilities upon an equal footing regarding the costly enterprise of constructing or acquiring utility facilities. To suggest otherwise is to attribute an unlikely, if not absurd, legislative result. We will not do so. *Guinn v. Light* (1990) Ind., 558 N.E.2d 821, 823.

---

**8.** Parenthetically, we take notice of the Definitions of General Applicability in Title 36, Local Government. I.C. 36–1–2–1 *et seq.* (Burns Code Ed.1981). First, a "municipal corporation" does not include a special taxing district for *any* purpose. I.C. 36–1–2–10. Second, a "municipality" still only means a city or town; "city" and "town" do not refer to "special taxing districts" and; all have mutually exclusive definitions. I.C. 36–1–2–3, –18, –21.

Second, Stucker left its "conservancy district" hat at the door when it elected to provide water supply systems pursuant to I.C. 13–3–4. Stucker correctly points out, albeit obliquely, that I.C. 13–3–4 supplements the general conservancy district statutes. In reality, the water supply systems statutes *supplant* several provisions that are key to the instant analysis. For purposes of furnishing water supply systems, Stucker became an independent legal entity, retaining the rights and powers granted by I.C. 13–3–3 (Conservancy Districts—Generally) *to the extent consistent with* I.C. 13–3–4 (Conservancy Districts—Water Supply Systems). I.C. 13–3–4–3 (emphasis supplied). Arguably, Stucker can no longer claim all of the characteristics and attributes of its alter-ego, i.e., a special taxing district, because I.C. 13–3–4–7 specifically precludes Stucker from repaying its financial obligations from the collection of a special benefits tax. Stucker's indebtedness for water supply systems purposes is payable solely from the net revenues of the water facilities. I.C. 13–3–4–7. Stucker's identity, as an owner and operator of water supply systems, is separate from and independent of its conservancy district status.

Third, it is the Indiana Utility Regulatory Commission, and not the Natural Resources Commission of Indiana, which now regulates Stucker's actions. I.C. 13–3–4–1(b). Upon Stucker's election, the Commission has the sole authority to oversee the schedule of rates and charges to Stucker's patrons. I.C. 13–3–4–6. The fact that the legislature intended Stucker's rate regulation to be subject to the jurisdiction of the Commission in the same manner as the regulation of rates and charges of municipal water utilities (I.C. 13–3–4–6) is insufficient, in and of itself, to transform Stucker into a municipal utility.

Moreover, the Commission's jurisdiction over Stucker's rates and charges continues unabated during the election period.[9] Although the freeholders in Stucker's district may elect the conservancy board pursuant to I.C. 13–3–3–34, the water customers who live outside of Stucker's district boundaries, and who are affected by Stucker's rates and charges, have no voice at all. Maintaining Commission jurisdiction provides the oversight needed to preserve the public's interests.

Finally, Stucker can no longer seek court approval in territorial matters, but must petition the Commission for permission to extend the water supply systems into areas which will serve additional users. I.C. 13–3–4–4(b). It is within the sole discretion of the Commission to determine whether public convenience and necessity will be furthered by the expansion of the territorial boundaries of a district's water supply systems. I.C. 13–3–4–4(d). In such matters of public concern, the legislature clearly intended that Stucker's water supply operations be placed under the watchful eye of the Commission.[10] The statutory distinctions are sufficiently significant to blunt

---

9. In this sense, Stucker is very different from a municipally owned utility. The legislature provided a means by which municipal utilities may remove themselves from the Commission's jurisdiction for the approval of rates and charges and for the issuance of stocks, bonds, notes, or other evidences of indebtedness. I.C. 8–1.5–3–9. A majority of the registered voters of the municipality may vote at the next election to withdraw the municipal utility from Commission jurisdiction. *Id.* The Commission's authority is replaced by local control. Thus, even though Stucker is correct in contending that the Commission is directed to treat conservancy districts in the same manner as municipal water utilities for rates and charges, it goes too far to conclude that the legislature intended that the Commission treat them similarly for all purposes. *Morgan County R.E.M.C. v. Indianapolis Power and*

*Light Co.* (1973) 261 Ind. 323, 327, 302 N.E.2d 776, 778 (applying the presumption that the legislature was aware of existing statutes on the same subject when enacting a particular piece of legislation).

10. It is equally true that the legislature spoke just as clearly when it *removed* municipally owned utilities from the jurisdiction of the Commission relative to territorial matters. The circuit or superior courts are charged with the responsibility of reviewing whether public convenience and necessity is furthered when a municipality intends to construct or acquire a utility in an area presently served by a public utility. I.C. 8–1.5–2–11(a). Such determinations entirely escape Commission scrutiny and are subject only to appellate review. I.C. 8–1.5–2–11(d).

the conclusion that Stucker should be classified as a municipally owned utility.

Ultimately, the facts reveal that in 1967, Stucker's board of directors elected to engage in the furnishing of water to the residents of several Indiana counties. To accomplish this purpose, as noted, Stucker obtained financing and purchased water distribution facilities which included a water treatment plant, transmission and distribution mains, elevated storage tanks, a booster station, and other necessary appurtenances. Stucker has continued to own, operate, and maintain its original water supply systems as well as to construct and purchase additional facilities to meet the increasing demand for water services to the public in areas adjacent to Stucker's district boundaries. Stucker's election, pursuant to I.C. 13–3–4, placed Stucker under the jurisdiction of the Commission concerning the regulation of furnishing water supply systems for domestic, industrial, and public use. To summarize, Stucker owns, operates, manages, and controls the plant and equipment needed for the production, transmission, delivery, and furnishing of water to the public.

■ The facts, as stipulated, must now be applied to the key public utilities definitions discussed at the start of our analysis. We are reminded that statutory examination and interpretation requires that words be given their common and ordinary meaning unless a contrary purpose appears in the statute itself. *Spaulding v. International Bakers Services, Inc.* (1990) Ind., 550 N.E.2d 307, 309. Accordingly, in I.C. 8–1–2–1(a), the definition of a "public utility" encompasses, among others, an association of individuals who own, operate, manage, or control any plant or equipment for the production, transmission, delivery, or furnishing of water.

The word "association" in its general sense means a "union of persons in a society for some particular purpose." Web-

ster's International Dictionary 167 (2d ed. 1943). This general and broad term is consistent with the legislature's use of the word "every" which prefaces the definition of a public utility. Within the utilities context, the meaning of "association" has been further clarified. *Lafayette Chapter of Property Owners Association v. City of Lafayette* (1959) 129 Ind.App. 425, 157 N.E.2d 287.

In construing the term "association" as used in the statutes governing the judicial review of Public Service Commission (now the Indiana Utility Regulatory Commission) rulings [11], this court concluded that "the legislature meant only such recognized groups of societies which have been recognized by the legislature and vested with certain powers, among them the power to sue or be sued." *Lafayette Chapter of Property Owners Association, supra,* 157 N.E.2d at 291. Stucker is such a legislatively-created entity, empowered to contract for the acquisition of land, to borrow money and secure indebtedness, and to purchase and sell water, *"and for these purposes may sue and be sued."* I.C. 13–3–4–3. In the instant case, Stucker's district board meets the definition of a public utility because it is an association of individuals whose purpose is to furnish water supply systems to the public.

■ Although the legislature expressly stated that municipalities are not included as public utilities, this exclusion does not apply to Stucker for the reasons discussed. Absent an indication that the legislature intended to treat conservancy districts with similar exclusivity, we decline to do so. We hold that Stucker is properly classified as a public utility.

### B. Fees

Having concluded that Stucker is a public utility, the question becomes whether the fee assessment for public utilities is appropriate in the instant case. The provi-

---

**11.** "Any person, firm, *association,* corporation, city, town, or public utility adversely affected by any final decision, ruling, or order of the commission may, within thirty (30) days from the date of entry of such decision, ruling, or order, appeal to the Court of Appeals of Indiana...." I.C. 8–1–3–1 (Burns Code Ed.1991) (emphasis supplied). Stucker's instant appeal is based upon this very provision.

sions authorizing the Commission to charge and collect fees are the foundation for the analysis. In resolving this issue, however, the genesis of Indiana's utility fee statutes is instructional.

The original provisions of the Public Utility Act directed that each public utility pay the costs and expenses of Commission investigations. Acts 1913, ch. 76, p. 167, § 74. The purpose of the statute was to impose the costs and expenses upon the public utilities, whose customers incidentally benefited from the Commission's actions, rather than to impose the burden generally upon the taxpayers. *State ex rel. Thompson v. Greencastle* (1942) 111 Ind.App. 640, 40 N.E.2d 388.

In 1969, the legislature created the Public Utility Fees provisions which are presently codified at I.C. 8–1–6. Pursuant to this chapter, the public policy of this state dictated that the expense of maintaining and fostering the effective regulation of public utilities shall be borne annually by "the public utilities subject to regulation and which enjoy the privilege of operating as public utilities in this state...." I.C. 8–1–6–1.[12] The annual fee is based upon a fixed percentage of the public utility's gross revenues. Consequently, neither the nature of the proceedings, the complexity of the issues, nor the number of appearances before the Commission are relevant to the fee assessment. For purposes of assessing the public utility fee, the term "public utility" embraces each and every

type of utility owner, as previously identified in I.C. 8–1–2–1(a), with the exception of municipalities. I.C. 8–1–6–3.

The legislature simultaneously changed the Public Utilities Act in order to clarify the category of fees properly charged to municipally owned utilities.[13] Since 1969, municipally owned utilities have been subject, at a minimum, to I.C. 8–1–2–70 (Expenses of investigations—Payments by utility) and I.C. 8–1–2–85 (Fee for issuing securities). There is no indication that the legislature's enactments meant to treat conservancy districts as though they were municipal utilities.[14] It seems clear that the legislature intended to implement a two-track system of fee assessment, i.e., fees applicable to public *or* municipally owned utilities.

The Commission is required to regulate Stucker as a public utility furnishing water supply systems pursuant to I.C. 13–3–4. The utility consumer counselor is called upon to represent the ratepayer, consumer, and public when Stucker becomes subject to the Commission's jurisdiction. The legislature authorizes the Commission, in discharging these duties, to assess an annual fee against every public utility which enjoys the privilege of operating as a public utility. Until the legislature directs otherwise, the Commission must implement a dual system of fee assessment based upon utility classification.

We are bound to interpret the intent of the legislature and to adhere to the public

12. The fees collected pursuant to this chapter are deposited into the public utility fund account. The fund is used to finance the budgets of the Commission and the office of the utility consumer counselor, including expert witness fees and a contingency fund in the amount of $250,000. I.C. 8–1–6–1.

13. The legislature amended the term "public utility," which was used in Ind.Ann.Stat. § 54–425 (Burns 1933), presently codified at I.C. 8–1–2–70, to read "municipal utility." Similarly, the present fee provisions of I.C. 8–1–2–85 apply only to municipalities.

14. We call attention to the fact that the Commission is required to charge a fee based upon the amount of any bonds, notes, or other securities which a municipality issues to finance its utility. I.C. 8–1–2–85. To illustrate, a $1,000,000 bond issue translates to a $2,500 fee which is deposit-

ed "in the commission public utility fund account established under IC 8–1–6, *as if they were fees collected under IC 8–1–6.*" I.C. 8–1–2–85 (emphasis supplied). Clearly, the legislature intended to supplement the public utility fee account by charging municipalities additional fees. Whether this equalizes the financial burdens imposed upon public and municipally owned utilities is not for us to decide.

Stucker also protests that the instant imposition of the public utility fee assessment is "unfair" because the Commission has not previously imposed the fee. Brief of Appellant at 14–16. Incorrect administrative actions or interpretations do not bind reviewing court. *Indiana & Michigan Electric Co. v. Public Service Commission of Indiana* (1986) 2d Dist. Ind.App., 495 N.E.2d 779, 782–83, *trans. denied.*

policy declarations concerning the regulation of public utilities in this state. Therefore, we hold that the Commission appropriately charged the public utility annual fee to Stucker Fork Conservancy District based upon Stucker's election to provide water supply systems pursuant to I.C. 13–3–4.

The order of the Commission is affirmed.

SHIELDS and BAKER, JJ., concur.